**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **THE OHIO CASUALTY INSURANCE** | ) | |
| **COMPANY,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 06-0317-WS-M** |
| | ) | |
| **HOLCIM (US) INC.,** *et al.*, | ) | |
| **Defendants,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE OHIO CASUALTY INSURANCE** | ) | |
| **COMPANY,** *et al.*, | ) | |
| **Counterclaim Defendants.** | ) | |

**ORDER**

This matter comes before the Court on Counter Defendant Industrial Services of Mobile, Inc.'s Motion for Summary Judgment (doc. 69) and Plaintiff / Counter Defendant Ohio Casualty's Motion for Summary Judgment (doc. 73).[1]  The Motions have been briefed and are ripe for disposition at this time.[2]

---

[1]       Both movants have requested oral argument.  Pursuant to Local Rule 7.3, the Court in its discretion may rule on any motion without oral argument.  After careful consideration of the parties' detailed written submissions, the undersigned is of the opinion that oral argument would not be of substantial assistance in resolving the issues presented. Accordingly, the movants' requests for oral argument are **denied**.

[2]       The Court's review of the Motions has been hampered by nonmovant's disregard of Section 13(c) of the Rule 16(b) Scheduling Order (doc. 28), which provides in pertinent part as follows:  "If a party's exhibits in support of or in opposition to a motion exceed 50 pages in the aggregate, then that party must deliver a courtesy hard copy of those exhibits to the Judge's chambers by mail or hand delivery."  (Doc. 28, at 6.)  Movants complied with this requirement; however, nonmovant did not, even though it submitted more than 350 pages of exhibits in connection with the Rule 56 issues.  Holcim's noncompliance has rendered it more difficult and time-consuming for the Court to examine Holcim's evidentiary submissions than to examine those of the movants.

I.      **Nature of this Action.**

On February 23, 2003, defendant Ronald White ("White") was injured while working as an employee of counterdefendant Industrial Services of Mobile, Inc. ("ISOM"), at a cement manufacturing plant operated by defendant Holcim (US) Inc. ("Holcim") in Theodore, Alabama, when he stepped into a hole and fell 24 feet.  This declaratory judgment action marks the second lawsuit filed to allocate financial responsibility for White's injuries among Holcim, ISOM and their respective layers of insurance coverage.  The first lawsuit (the "*White* Action"), filed in state court by White and his wife, Patricia White ("Mrs. White"), resulted in a $5 million settlement being paid to the Whites by Holcim and two insurance companies.  The present declaratory judgment action arises from efforts by Holcim to recover some $4 million in settlement proceeds from ISOM or one of ISOM's insurers, plaintiff The Ohio Casualty Insurance Company ("Ohio Casualty").

Ohio Casualty initiated this action on May 18, 2006 by filing a Complaint (doc. 1) against Holcim and two Holcim employees, Edward Thierry, Jr. ("Thierry") and Dennis Odom ("Odom").[3]  Ohio Casualty's Complaint maintained that Holcim, Thierry and Odom were not entitled to coverage under a commercial umbrella policy that Ohio Casualty had issued to ISOM for the time period encompassing White's accident.  On that basis, Ohio Casualty sought a declaration that it had no duty to defend or indemnify Holcim, Thierry and Odom in the *White* Action, and no duty to satisfy any settlement or judgment therein.  (Complaint, at 4.)

Holcim brought a counterclaim against Ohio Casualty, and joined ISOM in that counterclaim pursuant to Rules 13(h), 19 and 20, Fed.R.Civ.P.  (*See* doc. 9.)  In particular, Holcim alleged that ISOM had breached an agreement to indemnify and hold Holcim harmless by failing to fund the settlement of the *White* Action.  Holcim further alleged that Ohio Casualty had breached its contractual obligation by failing to recognize Holcim, Thierry and Odom as additional insureds under the Ohio Casualty umbrella policy issued to ISOM, and by failing to bankroll the settlement of the *White* Action pursuant to that umbrella policy.  In an Amended Counterclaim (doc. 42), Holcim added a third cause of action against ISOM for common law

---

[3]      The Whites were nominally listed as defendants in this action until Ohio Casualty voluntarily dismissed all claims against them on August 11, 2006.  (*See* docs. 21, 22.)

indemnity, alleging that Holcim was either not at fault or only technically or constructively at fault for White's accident, and that ISOM's negligent conduct was the efficient cause of that accident.

Ohio Casualty and ISOM have now moved for summary judgment on the claims asserted by Holcim, with Ohio Casualty also seeking summary judgment on the declaratory judgment cause of action set forth in the Complaint.

## II.    Background Facts.[4]

The relevant facts necessary to resolve these Motions for Summary Judgment are largely undisputed.

### A.    The Agreements Between ISOM and Holcim.

ISOM is a general contractor in the industrial sector that has performed substantial work for Holcim's facility in Theodore, Alabama, over the last several years.  (Holsonback Dep., at 11-12; Thierry Aff., at 2.)  Before a contractor is permitted to perform work at Holcim's Theodore plant, that contractor must submit a series of documents collectively referred to as a "Contractor Pre-Qualification Package," and including an indemnity and hold harmless agreement in Holcim's favor.  (Thierry Aff., at 2.)  The indemnity and hold harmless agreement is a pre-printed form prepared by Holcim.  (Earle Dep., at 28.)  In connection with its work for Holcim, ISOM has submitted multiple contractor pre-qualification packages to Holcim over the years.  (Thierry Aff., at 2.)

On March 25, 2002, ISOM signed an "Indemnity and Hold Harmless Agreement" as part of a Holcim contractor pre-qualification package.  (*Id.* at 2-3.)  In relevant part, the March 2002 Agreement stated ISOM's promise to defend, indemnify and hold Holcim harmless "from any and all loss, liability, claims, damages, judgments, expenses, costs or attorney's fees whether for property damage, personal injuries or death (herein, 'Losses'), arising from or in connection with ... the undersigned's entry upon Holcim's premises for the purpose and in consideration of performing various construction activities."  (Doc. 71, Exh. E.)  The March 2002 Agreement

---

[4]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, Holcim's evidence is taken as true and all justifiable inferences are drawn in its favor with respect to both Motions.

specified that ISOM's indemnification responsibility included, without limitation, "Losses attributable to the undersigned's negligence, acts or omissions, or the negligence, acts or omissions of any of the undersigned's agents, servants, contractors, employees or assigns." (*Id.*)[5] That agreement did not expressly exclude indemnity from losses attributable to Holcim's negligence.

Almost 11 months later, on February 21, 2003, Holcim and ISOM entered into a contract entitled "Supply Agreement" and pertaining to a project known as the "Raw Silos project" for Holcim's Theodore facility.  (Doc. 71, Exh. C.)  It is undisputed that this Supply Agreement was drafted by Holcim's corporate counsel and was a "standard legal form utilized by Holcim as a Supply Agreement with vendors throughout the country for different products."  (Earle Dep., at 26-27.)  The Supply Agreement provided that its terms were exclusive, and included certain terms and conditions appended as Exhibit A.  (Doc. 71, Exh. C, ¶¶ 2, 3.)  Paragraph 9 of that Exhibit A was an indemnification provision in which ISOM agreed to indemnify and hold Holcim harmless "from any and all claims, demands, actions, penalties, fines, losses, costs or other liabilities ... arising out of or resulting from [ISOM's] breach of warranty or performance of this agreement or any act or omission of [ISOM], whether occurring on [Holcim]'s premises or elsewhere.  However, ***[ISOM] shall have no obligation to [Holcim] to the extent such losses are attributable to the negligence or willful misconduct of [Holcim].***"  (Doc. 71, Exh. C, at Exh A, ¶ 9 (emphasis added).)

Three other provisions of the Supply Agreement are potentially germane to the issues presented on summary judgment.  First, in Paragraph 2(B) of that document, the parties "agree that the specifications for the Goods in the Raw Silos bid package, dated 1/21/03 (the "Specifications"), are incorporated by reference into the Agreement."  (Doc. 71, Exh. C, ¶ 2(B).)[6]  "Goods" is a defined term in the Supply Agreement, meaning the "service and material

---

[5]     The March 2002 Agreement was executed only by ISOM; therefore, the reference to the "undersigned" in that document means ISOM and ISOM only.

[6]     Holcim's evidence is that in soliciting bids for the Raw Silo project, the company sent a "Raw Silo Contractor Package" consisting of some 178 pages of documentation to all contractors making bids on the project.  (Harris Dep., at 15-17.)  One page in those voluminous materials was a blank "Indemnity and Hold Harmless Agreement" of the same form that ISOM

as described in Raw Silos bid package, dated 1/21/03." (*Id.*, ¶ 1.)  Second, in Paragraph 3(A), the Supply Agreement states that "[i]n the event of any conflict between the terms of this Agreement (other than Exhibit A) and the terms and conditions of Exhibit A, the terms of this document shall control." (*Id.*, ¶ 3(A).)  Third, Exhibit A to the Supply Agreement includes a paragraph in which ISOM "agrees to carry comprehensive general and products liability insurance in the amounts and of the type acceptable to" Holcim; promises to carry worker's compensation, employers liability insurance, commercial general liability insurance, and the like; and agrees to furnish Holcim with certificates "evidencing the existence of the aforementioned insurance naming [Holcim] as additional insured." (*Id.*, Exh. C, at Exh. A, ¶ 10.)  That same paragraph reflects that ISOM's obligation to carry this insurance "shall not limit in any way [ISOM]'s liability and its obligation to indemnify [Holcim] as provided for in this contract." (*Id.*)

### B.      The Commercial Umbrella Policy.

Ohio Casualty issued a Commercial Umbrella policy, bearing number BXO (03) 52 51 23 91, to ISOM covering the period of October 31, 2002 through October 31, 2003.  (Doc. 75, at Exh. A.)  The Ohio Casualty Policy provided for a per-occurrence limit of $10 million, and was excess coverage to an underlying general liability insurance policy issued to ISOM by nonparty Clarendon American Insurance Co., which provided for coverage limits of $1 million per occurrence.  (*Id.*)

The Ohio Casualty Policy set forth a definition of "Insured" that included "[a]ny person

---

had executed in March 2002, but with numerous blanks for the indemnitor, the consideration, the date of the relevant agreement or purchase order, the governing law, and supplemental terms. (Harris Dep., at 16; Doc. 87, Exh. H.)  There is no record evidence that Holcim ever requested or required ISOM to execute that form of "Indemnity and Hold Harmless Agreement" in connection with the Raw Silo project, or that ISOM ever executed such a form at any time following March 2002.  There is also no evidence as to what the context of this blank form was and what verbiage (if any) the bid package might have included concerning the need for ISOM to execute this particular form in connection with the project.  In any event, that Indemnity and Hold Harmless Agreement in the bid package was never completed and executed in connection with the Raw Silo project.  According to the Supply Agreement, the Raw Silo project bid package was dated January 21, 2003, some 10 months after ISOM had signed the previous Indemnity and Hold Harmless Agreement.

or organization, other than the Named Insured, included as an additional 'Insured' by virtue of an 'insured contract,' and to which coverage is provided by the 'underlying insurance' and for no broader coverage than is provided by the 'underlying insurance' to such additional 'Insured.'" (Doc. 75, at Exh. A, at 11.)  The term "Insured Contract" is likewise a defined term in the policy, meaning "any oral or written contract or agreement entered into by you and pertaining to your business under which you assume the 'tort liability' of another party to pay for 'bodily injury' or 'property damage' to a third person or organization ...." (*Id.*)

Also of potential relevance to the pending motions, the Ohio Casualty Policy includes a "Cross Suits Exclusion," which excludes from coverage "Any liability of any 'Insured' covered under this policy to any other 'Insured' covered under this policy." (*Id.*)

No endorsement to the Ohio Casualty Policy lists Holcim as an additional insured. ISOM's insurance agent furnished Holcim with a "Certificate of Liability Insurance" dated October 31, 2002.  (Doc. 75, at Exh. I.)  That Certificate recites ISOM's various insurance policies, including underlying commercial general liability insurance with Clarendon in the amount of $1 million per occurrence and excess insurance with Ohio Casualty in the amount of $10 million per occurrence.  (*Id.*)[7]  The Certificate lists Holcim as the "Certificate Holder" but states "N" in a box beside the words "Additional Insured." (*Id.*)  The back of the Certificate includes the following language immediately under the headline "IMPORTANT": "If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s)." (*Id.*)  Also, the back of the Certificate includes the word "DISCLAIMER" in bold type, under which the following is written: "The Certificate of Insurance on the reverse side of this form does not constitute a contract between the issuing insurer(s), authorized representative or producer, and the certificate holder, nor does it affirmatively or negatively amend, extend or alter the coverage afforded by the policies listed thereon." (*Id.*)

---

[7]     The Certificate actually does not mention Ohio Casualty by name, but instead attributes that excess policy to American National Fire Ins. Co.  There appears to be no dispute, however, that Ohio Casualty has purchased American National and that the excess policy recited on the Certificate was in fact the Ohio Casualty Policy.

C.       *The State Court Lawsuit.*

White sustained injuries on February 23, 2003, when he fell through a hole at Holcim's Theodore facility while working on the Raw Silo project as an employee of ISOM.  On October 2, 2003, White initiated the *White* Action by filing suit against Holcim, Thierry, Odom, and 120 fictitious defendants in the Circuit Court of Mobile County, Alabama.  The complaint in the *White* Action reflected that White brought claims against Holcim, Thierry and Odom for negligence and willfulness/ wantonness, and that Mrs. White brought claims for loss of consortium.  (Doc. 75, Exh. K.)[8]  The *White* Action complaint asserted that Holcim was negligent, willful or wanton in 13 different respects, and that its negligent, willful and/or wanton acts proximately caused White's injuries.  (*Id.*)[9]  An amended complaint filed nearly two years later added as new causes of action that Holcim, Thierry and Odom had been negligent or wanton in performing duties that they had voluntarily undertaken on the job site, and that White was a third-party beneficiary of a contract between ISOM and Holcim in which Holcim was responsible for maintaining and operating the job site in a safe manner.  (Doc. 75, Exh. L at 7-13.)

ISOM was not named as a defendant in the *White* Action.  Neither the original nor the

---

[8]       Holcim did not avail itself of this opportunity to bring third-party claims for indemnity or breach of contract against ISOM or Ohio Casualty in the *White* Action, thereby necessitating this litigation to resolve these additional matters allocating financial responsibility for White's accident.  Had Holcim brought third-party claims against Ohio Casualty and ISOM in the *White* Action, all factual issues and theories of liability could have been aired in a single proceeding, without the need for the piecemeal approach adopted here.

[9]       In particular, that complaint ascribed wrongdoing to Holcim, Thierry and Odom in the following respects: (1) exposing White to the hazard of falling on the job site, (2) failing to secure and/or install boards on the floor from which he fell, (3) improperly maintaining the boards from which White fell, (4) failing to secure, install or maintain guard/safety rails, (5) failing to install or maintain other safety guards/devices, (6) failing to install or maintain a proper walkway, (7) failing to discover and eliminate hazardous or unsafe conditions of which they knew or should have known, (8) failing to post warning signs and/or barricades to alert employees to the danger, (9) failing to provide White with a reasonably safe place to work, (10) failing to institute effective safety procedures at the job site, (11) failing to conduct adequate safety inspections at the job site, (12) failing to furnish a place of employment for White that was free from recognized hazards likely to cause death or serious harm, and (13) failing to comply with various rules, regulations and regulatory standards.  (*Id.*, ¶¶ 6, 9.)

amended complaints set forth any causes of action against ISOM or alleged that Holcim should be held liable for the acts or omissions of ISOM.  (Doc. 75, Exhs. K & L.)  However, ISOM and its workers' compensation insurance carrier petitioned and were permitted to intervene in the *White* Action to assert claims for reimbursement and subrogation of workers' compensation benefits and medical expenses paid to White.  (Doc. 71, Exh. I.)  Additionally, in response to a demand for a defense, ISOM's primary insurance carrier, Clarendon, appointed defense counsel and otherwise undertook to defend Holcim, Thierry and Odom.  (Doc. 42, ¶ 14.)

The *White* Action never made it to trial.  Instead, on May 24, 2006, pursuant to a court-ordered mediation, the parties entered into a settlement under which Holcim, Thierry and Odom agreed to pay the Whites $5 million in exchange for a full release and dismissal of the *White* Action with prejudice.  (Doc. 71, Exh. J.)[10]  The settlement documentation reflected that this $5 million payment was being made "entirely for the purpose of compromise and settlement of a disputed claim" and that it was not to "be construed as an admission of liability on the part of the RELEASEES, by whom liability is expressly denied."  (Doc. 71, Exh. K, at ¶ 2.5.)  Payment of these funds was allocated as follows: (a) ISOM's primary insurance carrier, Clarendon, paid its policy limits of $1 million; (b) Holcim itself paid $1 million; and (c) one of Holcim's excess carriers, nonparty Great American Alliance Insurance Company, paid $3 million.  (Doc. 42, ¶ 17.)[11]

In this action, Holcim maintains that Ohio Casualty and ISOM are legally obligated to reimburse Holcim and Great American for the entire $4 million they "advanced" to settle the *White* Action.  Ohio Casualty and ISOM have now moved for summary judgment, seeking a ruling that, as a matter of law, neither of them is obligated to contribute any funds to the *White* Action settlement.  Holcim has opposed both motions.  Because Ohio Casualty and ISOM's Rule

---

[10]     Ohio Casualty and ISOM were invited to attend the mediation session, and Ohio Casualty in fact attended.  (Doc. 42, ¶ 16.)  Neither ISOM nor Ohio Casualty contributed any funds to the *White* Action settlement, however.  (*Id.*, ¶ 17.)

[11]     In bringing its counterclaims against Ohio Casualty and ISOM in this action seeking to recover $4 million in settlement proceeds, Holcim alleges that Great American has authorized it to seek recovery of the full amounts paid by both Great American and Holcim in that settlement.  (*Id.*, ¶ 18.)

56 Motions rest on different grounds, each will be analyzed separately.

### III.    Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

In the insurance context, Alabama law provides that "[t]he issue whether a contract is ambiguous or unambiguous is a question of law for a court to decide. ... If the terms within a contract are plain and unambiguous, the construction of the contract and its legal effect become questions of law for the court."  *Nationwide Ins. Co. v. Rhodes*, 870 So.2d 695, 696-97 (Ala. 2003) (citation omitted); *see also B.D.B. v. State Farm Mut. Auto. Ins. Co.*, 814 So.2d 877, 879 (Ala.Civ.App. 2001) ("The interpretation of an insurance contract presents a question of law.").

### IV.    Analysis of ISOM's Motion for Summary Judgment.

As discussed *supra*, Holcim has brought counterclaims against ISOM for both contractual and common law indemnity, contending that ISOM is responsible to pay $4 million of the *White* Action settlement.  ISOM's Rule 56 Motion is predicated on the following reasoning: (a) the indemnification provision in Exhibit A to the Supply Agreement supersedes the earlier agreement and is controlling; (b) the Supply Agreement's indemnity provision states

that ISOM will not indemnify Holcim for Holcim's own negligence or willful misconduct; (c) the claims asserted against Holcim in the *White* Action were confined to allegations of negligence or willful misconduct by Holcim, so ISOM owes no contractual indemnity obligation to Holcim for the settlement of those claims; and (d) common law indemnity is negated by the existence of a written indemnity contract.  By contrast, Holcim's position is that there are genuine issues of material fact as to which indemnity agreement governs, that White's injuries were actually caused by the negligence of ISOM (not that of Holcim) so ISOM's indemnity obligation attaches under either indemnity agreement, and that common law indemnity applies because Holcim was only technically or constructively at fault.

### A. *Which Indemnity Agreement Controls?*

The threshold question for evaluating Holcim's claims of contractual indemnity is whether the March 2002 "Indemnity and Hold Harmless Agreement," or the indemnification provision set forth in the February 2003 Supply Agreement is applicable here.  This inquiry is not merely of academic interest, given the material difference between the two documents.  In particular, the February 2003 indemnity clause expressly excuses ISOM from any indemnity obligation to Holcim for losses "to the extent such losses are attributable to the negligence or willful misconduct of" Holcim.  (Doc. 71, Exh. C, at Exh A, ¶ 9.)  By contrast, the March 2002 agreement provides that ISOM will indemnify Holcim from "any and all loss ... arising from or in connection with ... the undersigned's entry upon Holcim's premises for the purpose and in consideration of performing various construction activities," with no carve-out for losses attributable to Holcim's own negligence.  (Doc. 71, Exh. E.)

If an earlier-executed indemnity agreement has no exclusion for losses attributable to Holcim's negligence, but a later-executed indemnity agreement has such an exclusion, well-settled Alabama law provides that the later-executed agreement controls.  Indeed, the Alabama Supreme Court has explained that "parties are free to modify agreements, and if the terms of a subsequent agreement contradict the earlier agreement, the terms of the later agreement prevail." *Cavalier Mfg., Inc. v. Clarke*, 862 So.2d 634, 641 (Ala. 2003).  "When parties execute successive agreements and the two agreements cover the same subject matter and include inconsistent terms, the later agreement supersedes the earlier agreement." *Hunter v. Wilshire Credit Corp.*, 927 So.2d 810, 814 (Ala. 2005) (quoting *Cavalier*, 862 So.2d at 641); *see*

*generally Restatement (First) of Contracts*, § 408 ("A contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract.").  Thus, a plain reading of *Cavalier* and *Hunter* establishes that, as a matter of law, the indemnity provision in the February 2003 Supply Agreement trumps that set forth in the March 2002 Agreement.

Notwithstanding these clear precedents, Holcim maintains that genuine issues of fact remain as to which indemnity provision (both of which were drafted by Holcim) controls.[12]  To reach this conclusion, Holcim embarks on a tortured interpretation of the Supply Agreement. Holcim focuses on Section 2(B) of that Agreement, which provides that "the specifications for the Goods in the Raw Silos bid package, dated 1/21/03 ... are incorporated by reference into the Agreement."  One page of that 178-page bid package was an unsigned "Indemnity and Hold Harmless Agreement" form riddled with blanks, but otherwise quite similar to the March 2002 Agreement.  The bid package form (like the March 2002 Agreement, but unlike the indemnity provision found in Exhibit A of the Supply Agreement) lacked a statement that no indemnity obligation would attach to losses attributable to Holcim's negligence or willful misconduct. Comparing the form in the bid package to the indemnity clause in Exhibit A to the Supply Agreement, Holcim finds a conflict.  Because Section 3(A) of the Supply Agreement provides that in the event of any conflict between the terms of the Supply Agreement (other than Exhibit A) and the terms of Exhibit A, the Supply Agreement controls, Holcim argues that the blank, unsigned, and incomplete Indemnity and Hold Harmless Agreement in the bid package must constitute the governing indemnity agreement between the parties, nullifying the indemnity provision in Exhibit A.

This strained logic cannot withstand scrutiny and it cannot create a genuine issue of fact. Construing the evidence in the light most favorable to Holcim, there is no basis for concluding that the blank indemnity form in the bid package amounts to "specifications for the Goods in the Raw Silos bid package."  How could an indemnity agreement be deemed a "specification" for

---

[12]     Although Holcim repeatedly alleges that a fact question exists, it does not identify what disputed fact or facts must be decided to resolve the question of which indemnity agreement governs, nor does it indicate what evidence would be needed to resolve any such fact question.

"Goods," which is defined as the service and material that ISOM was supplying to Holcim in the Raw Silos project?  It couldn't, unless one ignores the common, everyday definition of the term "specifications," as "a statement prescribing materials, dimensions, and quality of work for something to be built, installed, or manufactured."  *American Heritage Dictionary of the English Language* (4th ed.).  Under the ordinary meaning of the term, then, "specifications" is not a comprehensive enumeration of all terms and conditions of a parties' contractual relationship. The Court cannot construe the contract in a manner that ignores the term's plain meaning.  *See H & S Homes, L.L.C. v. Shaner*, 940 So.2d 981, 988 (Ala. 2006) ("When a court construes a contract, the clear and plain meaning of the terms of the contract are to be given effect, and the parties are presumed to have intended what the terms clearly state.") (citations omitted); *Homes of Legend, Inc. v. McCollough*, 776 So.2d 741, 746 (Ala. 2000) ("Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning.").  The fallacy of Holcim's construction is underscored by the Supply Agreement's use of the term "specifications" in the following context: "Buyer shall reserve the right at any time to change any Order (whether by adjustment order or otherwise) as to Specifications, delivery, packaging, or means of shipment."  (Doc. 71, Exh. C, ¶ 3(D).)  Surely Holcim was not intending by this clause to reserve the right to change the indemnity provision at any time, but was instead referring to the materials, dimensions and quality of work to be performed by ISOM.  In short, then, "the specifications for the Goods" incorporated into the Supply Agreement have nothing to do with an indemnity provision.

Furthermore, it would be absurd to assign primacy to an unsigned, incomplete indemnity agreement that Holcim had secreted within a 178-page bid package, over a completed indemnity provision set forth in a Supply Agreement executed by the parties just days before the accident. Nor has Holcim pointed to any evidence tending to show that Holcim ever communicated to ISOM, much less that ISOM ever agreed, that this blank indemnity form contained in the bid package (missing such critical terms as consideration, the agreement or purchase order to which it applied, the choice of law, and supplemental terms) would eclipse the very clear indemnity provision set forth in Exhibit A to the Supply Agreement.

"General contract law requires a court to enforce, as it is written, an unambiguous and lawful contract."  *Drummond Co. v. Walter Industries, Inc.*, --- So.2d ----, 2006 WL 3462146,

*24 (Ala. Dec. 1, 2006).  The Court finds that the Supply Agreement unambiguously includes a written indemnification provision in paragraph 9 of Exhibit A.  The Court further finds that the blank indemnity form in the bid package does not fall within the plain meaning of the phrase "specifications for the Goods" and therefore was not incorporated in the Supply Agreement.  Holcim has identified no basis for its labored, overreaching definition of the term "specifications for the Goods."  As such, there is no conflict between the terms of the Supply Agreement and the terms of the indemnification provision in Exhibit A thereto, so paragraph 3(A) of the Supply Agreement is inapplicable.  Simply put, the unambiguous terms of the Supply Agreement include one and only one indemnification provision, namely, that found in Exhibit A.  By operation of law, and pursuant to *Cavalier* and *Hunter*, the indemnification provision in the February 2003 Supply Agreement rescinds and supersedes the "Indemnity and Hold Harmless Agreement" executed by ISOM some 11 months earlier.  Accordingly, it is the finding of this Court, as a matter of law, that the indemnification provision set forth in Paragraph 9 of Exhibit A to the Supply Agreement fixes ISOM's indemnification obligations to Holcim arising from White's accident, which occurred just days after execution of that Supply Agreement.[13]

> **B.**    ***Do the Allegations of the* White *Action Complaint Preclude Indemnity?***

The focal point of ISOM's Motion for Summary Judgment is its contention that the $4 million in settlement proceeds from the *White* Action for which Holcim seeks indemnity is

---

[13]        In determining that the indemnity provision set forth in Exhibit A to the Supply Agreement is controlling, the Court declines ISOM's invitation to examine parol evidence concerning what the parties subjectively thought or believed the controlling indemnity provision was.  After all, "[i]t is well-settled ... that absent some evidence of fraud, mistake, or illegality, parties to a contract may not, by parol evidence, vary the terms of an unambiguous instrument. ... Whether a contract is ambiguous is a question of law for the court."  *Lloyd Noland Foundation, Inc. v. City of Fairfield Healthcare Authority*, 837 So.2d 253, 266 (Ala. 2002) (internal quotations and citations omitted); *see also Marriott Int'l, Inc. v. deCelle*, 722 So.2d 760, 762 (Ala. 1998) (describing general rule that parol evidence is not admissible to contradict, vary, add to or subtract from terms of written contract, except that such evidence will be allowed to clarify an ambiguous contract); *Brown Mechanical Contractors, Inc. v. Centennial Ins. Co.*, 431 So.2d 932, 942 (Ala. 1983) ("Extrinsic evidence may be admitted to interpret a contract only if the trial judge finds as a matter of law that the contract is ambiguous.") (citation omitted).  There being no ambiguity in the Supply Agreement with respect to the indemnity provision, parol evidence is not admissible to clarify its meaning.

beyond the scope of Supply Agreement's indemnity provision.  The Court agrees.

Alabama courts subject agreements by which one party agrees to indemnify another for the other's acts or omissions to careful scrutiny.  *See Royal Ins. Co. of America v. Whitaker Contracting Corp.*, 824 So.2d 747, 752 (Ala. 2002).  Indeed, in *Brown Mechanical Contractors, Inc. v. Centennial Ins. Co.*, 431 So.2d 932 (Ala. 1983), the Alabama Supreme Court recognized that under Alabama law, indemnification is available for one's own negligence "only where the parties knowingly ... enter into an agreement whereby one party agrees to indemnify the other, including indemnity against the indemnitee's own wrongs, *if expressed in clear and unequivocal language*."  *Id.* at 945 (citation omitted); *Royal Ins. Co.*, 824 So.2d at 752 ("An agreement by one person to indemnify another for the other's negligent conduct is enforceable only if the indemnity provisions are unambiguous and unequivocal.") (citation omitted); *see also Crigler v. Salac*, 438 So.2d 1375, 1386 (Ala. 1983) (no right to indemnification where agreement lacked clear indication of intention to indemnify against negligence of indemnitee).  Thus, the general rule in Alabama is "that a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting from his own negligent acts unless such intention is expressed in clear and unequivocal terms, or unless no other meaning can be ascribed to it."  *Royal Ins. Co.*, 824 So.2d at 752 (citation omitted).  "[T]he burden of proof is on the indemnitee to establish the requirements set forth above before the indemnitee is entitled to indemnification under such an agreement."  *Id.* at 753.

Far from containing clear and unequivocal language extending an indemnity obligation to Holcim's own wrongdoing, the Supply Agreement's indemnity provision unequivocally states that ISOM shall have no obligation to indemnify Holcim against any losses "to the extent such losses are attributable to the negligence or willful misconduct of [Holcim]."  Thus, if the settlement proceeds in the *White* Action represent losses attributable to Holcim's negligence or willful misconduct, then ISOM owes no indemnity obligation to Holcim for those amounts.  By contrast, if those settlement proceeds are not losses attributable to Holcim's negligence or willful misconduct, then they do fall within the scope of that indemnity provision.

Inspection of the complaint in the *White* Action reveals that the Whites were suing Holcim and two of its managers (Odom and Thierry) for negligence, willfulness and wantonness

based on a panoply of acts and omissions by those defendants.[14]  By way of illustration, the state-court complaint alleged that Holcim, Odom and Thierry had proximately caused White's injuries by negligently exposing him to a hazardous job site, failing to secure the boards covering the hole in the floor, failing to install or maintain safety rails, failing to discover and eliminate hazardous conditions on their job site, failing to institute effective safety procedures on the job site, failing to conduct adequate safety inspections, and failing to post warning signs or barricades around the hole in the floor.  Nothing in the state-court complaint states or can reasonably be read as suggesting that the Whites sought to hold Holcim liable through some sort of pass-through or vicarious liability for ISOM's negligence or wrongdoing; rather, the state-court pleadings are quite clear that the Whites sought relief from Holcim for the negligent, willful, and wanton acts and omissions of Holcim itself.

Notwithstanding the plain language of the *White* Action complaint, Holcim urges this Court to recast the state-court lawsuit as something else because "there is no evidence in the record of negligence or willful misconduct by Holcim, [and] the record is replete with evidence of negligent conduct by ISOM which caused or contributed to the injury suffered by White." (Opposition Brief (doc. 86), at 8.)  Holcim identifies substantial record evidence that it contends supports its characterization that ISOM is to blame for the accident that befell White on February 23, 2003.  The defect with this argument is that it ignores the undeniable and irrefutable fact that

---

[14]      Holcim is quick to point out that the *White* Action complaint also purports to assert claims against some 120 fictitious defendants.  That fact is irrelevant to the Court's analysis.  To the extent that Holcim means to imply that the specific allegations of negligence, willfulness and wantonness directed at "defendants" in the *White* Action could also have encompassed ISOM because ISOM might have been one of those fictitious defendants, such an argument must fail.  Alabama law is clear that a defendant may be listed as a fictitious party only "[w]hen a party is ignorant of the name of an opposing party and so alleges in the party's pleading."  Rule 9(h), Ala.R.Civ.P.; *see also Ex parte Chemical Lime of Alabama, Inc.*, 916 So.2d 594, 597-98 (Ala. 2005) (fictitious party pleading contemplates that "the plaintiff must have been ignorant of the true identity of the defendant and must have used due diligence in attempting to discover it").  Obviously, White was fully aware of ISOM's identity when he filed the state-court complaint because he was an employee of ISOM; therefore, ISOM could not logically have been included amidst the fictitious parties.  Besides, any claims White might have wished to assert against ISOM would have been barred by the exclusivity of the workers' compensation remedy.

the *White* Action sounded exclusively in alleged negligence, willfulness and wantonness by Holcim, not by ISOM.  "[A]n indemnitee cannot transform the underlying claim by the injured party into a different lawsuit by making allegations of negligence against the indemnitor in a subsequent action for indemnity."  *McNally & Nimergood v. Neumann-Kiewit Constructors, Inc.*, 648 N.W.2d 564, 578 (Iowa 2002).

        Holcim argues that the Court must look behind the state-court complaint in determining whether the settlement payment falls within the scope of the indemnity provision, while ISOM insists that the Court is limited to the face of the state-court pleadings.  Unfortunately, the parties' briefs on this question are largely unhelpful, as neither side has cited a single published authority from any jurisdiction to support their respective positions on this crucial question. That said, the Court's research has disclosed a number of decisions (albeit none from Alabama) in which courts have held that amounts paid by an indemnitee in settlement of a suit sounding in negligence by that indemnitee are necessarily the result of the indemnitee's own negligence, such that the indemnitee cannot recover those settlement proceeds under an indemnity provision that excludes indemnification for the indemnitee's negligent conduct.  *See, e.g., McNally*, 648 N.W.2d at 578 ("When the underlying litigation settled by a potential indemnitee was limited to allegations of the indemnitee's own negligence not covered under the indemnification agreement, there can be no claim for indemnity because the amount paid in the settlement could only have been the result of the indemnitee's own noncovered negligence."); *Fifield v. South Hill Ltd. Partnership*, 20 F. Supp.2d 366, (D. Conn. 1998) (in indemnity action brought by premises owner where contractor's employee was injured on job site, any liability by premises owner to employee was necessarily based on premises owner's own negligence, thereby precluding premises owner from receiving indemnity from contractor given that indemnity clauses excluded recovery for premises owner's negligence); *Gray v. Cleaning Systems and Suppliers, Inc.*, 834 F. Supp. 123, 128 (S.D.N.Y. 1993) (opining that indemnity clause is inapplicable where it provided that employer could only be liable to shipper if shipper's liability was not based on negligence, but shipper could only be liable to plaintiff if its conduct were negligent).[15]

_____

        [15]        The only authority cited by Holcim on this issue is *Tobias v. FirstEnergy Nuclear Operating Co.*, 2004 WL 4910146, (N.D. Ohio Oct. 5, 2004).  Aside from being unpublished and

These authorities hew to eminently sensible reasoning. After all, if an indemnitee is sued by a third party for claims sounding exclusively in wrongdoing by that indemnitee, and the indemnitee settles the claims, it would defy logic and common sense to find that those "losses" (*i.e.*, the settlement payments) are attributable to anything other than the indemnitee's own wrongdoing. At the very least, it would appear incumbent on the indemnitee to show that those payments were actually made to avoid exposure to pass-through or vicarious liability, rather than to avoid a reasonable possibility of liability for its own misdeeds. Holcim alludes to this motivation, in an off-handed manner, by stating in conclusory terms that it settled the *White* Action because of "a concern that, under Alabama law, Holcim would be held liable for the actions of ISOM." (Opposition Brief, at 13.) Holcim does not expound on this assertion, much less offer a cogent recitation of the principles of Alabama law that it felt would expose it to liability in the White *Action* for ISOM's misconduct, even in the absence of any negligence by Holcim and notwithstanding the unequivocal allegations in the state-court complaint that the Whites were accusing Holcim of negligence, wantonness and willfulness and not simply attempting to hold it liable vicariously for ISOM's conduct. The Court will not endeavor to construct Holcim's argument for it, or to piece it together from a fragmentary deposition excerpt taken from Holcim's counsel in the *White* Action.[16] If Holcim believes that the *White* Action

_____

from a different jurisdiction, *Tobias* is readily distinguishable on its face. The *Tobias* court did not purport to declare a blanket rule that courts must always look behind the allegations of the underlying complaint to determine whether the indemnitee was or was not negligent. Rather, *Tobias* involved a scenario in which the indemnitee had been granted summary judgment in the underlying claims based on a judicial determination that the indemnitee had not been negligent. In the subsequent indemnity proceedings brought by the indemnitee to recover its costs of defending the underlying suit, the *Tobias* court found that the indemnitee was not barred from such recovery by the mere allegations of negligence in the underlying suit given the prior judicial determination that the indemnitee was not, in fact, negligent. Here, by contrast, there was no such judicial determination in the underlying state-court litigation; instead, the Whites sued Holcim for Holcim's own negligence, willfulness and wantonness, and Holcim and its insurer paid $4 million to settle those claims of Holcim's wrongdoing.

[16]     The deposition excerpt at issue includes statements that counsel was concerned that Holcim could be held liable "if there was evidence of control [by Holcim] in the method and manner in which the work was done." (Stott Dep., at 76.) That control, and the negligent exercise of same, would still be negligence attributable to Holcim, rather than mere vicarious

exposed it to liability for something other than its own negligence and misconduct, then it must explain to this Court how it could be so.  It has not, but has simply asked this Court to accept on faith that such is the case.[17]

In short, Holcim cannot prevail on its claims of contractual indemnity against ISOM for the following reasons: (1) the controlling indemnity provision was drafted by Holcim and has an exclusion for losses attributable to Holcim's negligence or willful misconduct, without limiting that exclusion to "active negligence" or the like; (2) the *White* Action was predicated exclusively on the negligence, willfulness or wantonness of Holcim (and its agents, Odom and Thierry); (3) in settling the *White* Action, Holcim resolved claims that it had engaged in negligent, wanton and willful conduct, based on apparent concern that Holcim had in fact exercised control over the job site in a manner that could be deemed negligent; (4) losses incurred by Holcim in settling the *White* Action were necessarily attributable to Holcim's own negligence or willful misconduct because those were the only claims brought in the *White* Action; and (5) Holcim's *post hoc* attempt to transform the *White* Action into a case about mere vicarious liability for Holcim resulting from negligent acts by ISOM cannot succeed, as a matter of law, because it conflicts with the plain language of the pleadings in the *White* Action and because Holcim has made no showing that Alabama law would allow Holcim to be held liable in the *White* Action for anything other than Holcim's own negligence or willful misconduct.

### C.     Is Holcim Entitled to Common Law Indemnity?

In the alternative, Holcim seeks to hold ISOM liable under a theory of common law

---

liability in the absence of any negligent acts or omissions by Holcim; therefore, even if the Court were to try to erect Holcim's argument for it from the deposition excerpts provided, that argument would still land well shy of establishing that Holcim settled the *White* Action for some reason other than to avoid liability for claims that it had negligently exercised control over the job site.

[17]     Holcim has not argued that its settlement of the *White* Action was permissible under a "purely voluntary" theory or that such settlement was motivated by non-legal reasons; therefore, the Court has no occasion to consider lines of authority examining the issue from that angle.  To the contrary, Holcim's evidence is that, while it disclaimed liability in the settlement papers, it settled the *White* Action because of concern that the Whites would carry the day against it at trial.  (Stott Dep., at 75-77 (referencing witness testimony that Holcim had done "a lot of different things" to control the job site where the injury occurred).)

indemnity.  To be sure, Alabama courts have allowed common law indemnity claims where a joint wrongdoer "has not been guilty of any fault, except technically or constructively, or where both parties are fault, but the fault of the party from whom indemnity is claimed was the proximate or primary cause of the injury."  *Crigler*, 438 So.2d at 1385; *see also SouthTrust Bank v. Jones, Morrison, Womack & Dearing, P.C.*, 939 So.2d 885, 902 (Ala.Civ.App. 2005).  But there is an insuperable obstacle to Holcim succeeding on a common law indemnity claim here, inasmuch as a clear majority of courts have found that a party is proscribed from recovering on an implied indemnity theory where the parties executed an express written indemnity agreement. *See, e.g., Northwestern Nat. Ins. Co. of Milwaukee, Wisconsin v. Lutz*, 71 F.3d 671, 677 (7th Cir. 1995) ("We agree that the existence of a separate indemnification agreement dictates that the rights of the parties will be determined according to that document," rather than implied indemnity princples); *Commercial Ins. Co. of Newark v. Pacific-Peru Const. Corp.*, 558 F.2d 948, 953 (9th Cir. 1977) ("resort to implied indemnity principles is improper when an express indemnification contract exists").[18]

Holcim has no answer to this line of authority, and indeed "acknowledges that the existence of a contractual right of indemnity may preempt its common law rights."  (Opposition Brief, at 14.)  Such an acknowledgment is prudent.  This Court joins the myriad authorities cited above and finds that parties' rights to common law indemnity are cut off where those parties enter into an express indemnity agreement, through which they themselves delineate when and under what circumstances an indemnification obligation will arise.  As such, common law

---

[18]     *See also Wyoming Johnson, Inc. v. Stag Industries, Inc.*, 662 P.2d 96, 101 (Wyo. 1983) ("Implied theories of indemnity are not viable in the face of an express indemnity agreement.") (collecting the numerous cases); *Jones v. Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 453 F. Supp. 527, 539-40 (W.D. Pa. 1978) ("a written contract of indemnity will govern the parties' relationship and make common law indemnity inapplicable"); *Southern Pac. Co. v. Morrison-Knudsen Co.*, 338 P.2d 665, 670 (Or. 1959) ("When a contractual theory is employed to effectuate recovery, the common-law tort doctrines of contribution and indemnity are abrogated or superseded for the purpose of determining liability, although the contractual claim arises out of a liability flowing from the indemnitee's negligent conduct."); *Installation Services, Inc. v. Crown Castle Broadcast USA Corp.*, 2006 WL 2024220, *9 (N.D. Ill. July 13, 2006) (explaining that a plaintiff cannot recover under a theory of implied indemnity where parties have entered into a written indemnity agreement).

indemnity principles are inapplicable here, and ISOM is entitled to entry of judgment in its favor as a matter of law on that cause of action.

## V.     Analysis of Ohio Casualty's Motion for Summary Judgment.

Also before the Court is Ohio Casualty's Motion for Summary Judgment (doc. 73), in which it seeks judgment in its favor as a matter of law on both Ohio Casualty's claims against Holcim for declaratory judgment, and on Holcim's counterclaim for breach of contract.  Ohio Casualty provided commercial umbrella coverage to ISOM at the time of White's injury. Holcim's position is that it is an "additional insured" on the Ohio Casualty policy and that Ohio Casualty is therefore contractually obligated to extend coverage to Holcim for the $4 million that Holcim and Holcim's insurer "advanced" to settle the *White* Action.

The parties' briefs address numerous tangentially relevant issues, such as the Certificate of Insurance issued to Holcim, the lack of an endorsement on the Ohio Casualty policy adding Holcim as an additional insured, whether ISOM satisfied its contractual duty to procure commercial umbrella coverage for Holcim, whether Holcim waived any such non-performance by ISOM, and the like.  None of those issues need be addressed to resolve the Motion for Summary Judgment because they involve claims and allegations that either have not been joined in this lawsuit, or that are not germane to Holcim's theory of liability.[19]

The crux of the parties' legal dispute with respect to the claims by and against Ohio Casualty is a single discrete issue.  Holcim contends that it is an "additional insured" under the Ohio Casualty policy because the indemnity agreement(s) between Holcim and ISOM constitute

---

[19]     In particular, although Ohio Casualty's initial brief raises all of these issues, it is abundantly clear from Holcim's response (doc. 84) that Holcim does not contend that the Certificate of Insurance issued to it renders it an additional insured.  Moreover, there is no evidence that the Ohio Casualty policy required an endorsement as a necessary precondition to Holcim being deemed an additional insured.  Also, Ohio Casualty's arguments concerning whether ISOM was contractually bound to procure umbrella coverage for Holcim and whether Holcim waived any such non-performance by ISOM are red herrings because Holcim has asserted no such causes of action against ISOM.  Stripped to its essence, the question being litigated in Ohio Casualty's Motion for Summary Judgment is simply whether Holcim is rendered an "additional insured" by virtue of the indemnity agreement set forth at Paragraph 9 of Exhibit A to the Supply Agreement.

-20-

"insured contracts" that confer upon it "additional insured" status.  Ohio Casualty disagrees.[20]
The Court has already found, in section IV, *supra*, that the only operative indemnity agreement
between Holcim and ISOM at the time of White's injury was the indemnity provision contained
in Paragraph 9 of Exhibit A to the Supply Agreement; therefore, this argument will be evaluated
by reference to that agreement alone.[21]

The Ohio Casualty policy defines "insured" as including "[a]ny person or organization ...
included as an additional 'Insured' by virtue of an 'insured contract,' and to which coverage is
provided by the 'underlying insurance,' and for no broader coverage than is provided by the
'underlying insurance' to such additional 'Insured'."  (Doc. 75, Exh. A, at 11.)  The term
"insured contract" is defined as "any oral or written contract or agreement entered by you and
pertaining to your business under which you assume the 'tort liability' of another party to pay for
'bodily injury' or 'property damage' to a third person or organization ....  'Tort liability' means a
civil liability that would be imposed by law in the absence of any contract or agreement."  (*Id.*)

Holcim argues, and Ohio Casualty does not contest, that Holcim was covered by the
underlying insurance and that Holcim seeks no broader coverage under the Ohio Casualty policy
than was provided by such underlying insurance.  Nor can there be any genuine dispute that the
indemnity provision in Exhibit A to the Supply Agreement was an "insured contract," as defined
in the Ohio Casualty policy, inasmuch as it plainly is a written agreement entered into by ISOM
and pertaining to its business under which it assumed Holcim's tort liability to pay for bodily
injury or property damage to a third party.

---

[20]        This dispute can be resolved by reference to the plain language of the Ohio
Casualty policy; therefore, the Court declines to consider the parol evidence offered by Ohio
Casualty to show that Holcim and Holcim's insurer believed that Holcim would not qualify as an
additional insured under the Ohio Casualty policy.  *See, e.g., Brown Mechanical*, 431 So.2d at
942 ("Extrinsic evidence may be admitted to interpret a contract only if the trial judge finds as a
matter of law that the contract is ambiguous.").

[21]        The previous March 2002 indemnity agreement had been rescinded or superseded
by operation of law when the February 2003 Supply Agreement was executed; therefore, that
earlier agreement is not applicable to this analysis.  Likewise, the blank form agreement in the
bid package was neither executed nor incorporated into the Supply Agreement, so it cannot
constitute an "insured contract."

The sole remaining question is whether Holcim is "included as an additional 'Insured' by virtue of an 'insured contract.'" Of course, in the "insured contract" in this case, ISOM only assumed Holcim's tort liability for bodily injury that was not attributable to Holcim's negligence or willful misconduct. The Court has already found, *supra*, that the settlement proceeds paid by Holcim and its insurer in the *White* Action are necessarily losses attributable to Holcim's negligence or willful misconduct because those were the only claims made by the Whites against Holcim. Accordingly, Holcim is claiming "additional insured" status under the Ohio Casualty policy to obtain coverage for a loss that falls outside the scope of the "insured contract" on which Holcim predicates its "additional insured" status. Holcim does not explain, and the Court cannot fathom how, Holcim could be deemed an "additional insured" with respect to the *White* Action settlement when the "insured contract" on which Holcim relies for such "additional insured" status did not apply to that settlement. Stated differently, Holcim can be covered under the Ohio Casualty policy as an additional insured only as to losses within the scope of the "insured contract" that gives rise to its additional insured status.[22] Therefore, the Court finds that with respect to the losses for which Holcim seeks insurance coverage in these proceedings, Holcim was not "an additional 'Insured' by virtue of an 'insured contract,'" because the "insured contract" specifically excluded the types of losses for which Holcim now demands coverage. This determination is fatal to Holcim's attempts to obtain coverage under the Ohio Casualty

---

[22]     In addition to the rationale set forth *supra*, this interpretation is bolstered by three points. First, the "Coverage" section of the Ohio Casualty policy states that coverage will be provided for certain excess amounts "assumed by the 'Insured' under an 'insured contract.'" (Doc. 75, Exh. A, at 5.) ISOM did not assume the losses claimed by Holcim in the governing indemnity provision that constitutes the "insured contract" in this case; therefore, there can be no coverage under the plain language of the policy. Second, the Eleventh Circuit has found in a similar situation that "Ohio Casualty's policy covers to the extent of [the indemnitor]'s obligation pursuant to its contract indemnifying [the indemnitee]." *Twin City Fire Ins. Co. v. Ohio Cas. Ins. Co.*, 480 F.3d 1254, 1264 (11th Cir. 2007). As determined in *Twin City*, there is no coverage to Holcim under the Ohio Casualty policy for losses beyond ISOM's indemnity obligation to Holcim. Third, Holcim argued in its brief that "the Ohio Casualty Policy covers Holcim to the extent of ISOM's obligation pursuant to its contract indemnifying Holcim." (Opposition Brief (doc. 84), at 21.) Holcim seeks coverage here going beyond ISOM's obligation in the indemnity agreement; therefore, there is no coverage under Holcim's own formulation of the issue.

policy, and is dispositive of Holcim's Motion for Summary Judgment.[23]

**VI.     Conclusion.**

For all of the foregoing reasons, it is **ordered** as follows:

1.      Counter Defendant Industrial Services of Mobile, Inc.'s Motion for Summary Judgment (doc. 69) is **granted**, and the counterclaims brought against it by Holcim (US) Inc., Edward J. Thierry, Jr. and Dennis R. Odom are **dismissed with prejudice**.

2.      Plaintiff / Counter Defendant Ohio Casualty's Motion for Summary Judgment (doc. 73) is **granted**.  Judgment will be entered in Ohio Casualty's favor on all claims in this action.  The counterclaims brought against it by Holcim (US) Inc., Edward J. Thierry, Jr. and Dennis R. Odom are **dismissed with prejudice**. Additionally, the Court hereby **declares** that Ohio Casualty is not obligated to indemnify Holcim (US), Inc., Edward J. Thierry, Jr. or Dennis Odom for the claims or settlement in the underlying lawsuit from which this action arose.

3.      A separate judgment will enter.

DONE and ORDERED this 24th day of September, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[23]        In light of this determination, the Court declines to reach the parties' arguments concerning whether Holcim's claims would be barred by the policy's "Cross Suits Exclusion" even if Holcim were an additional insured by virtue of an insured contract with respect to the losses in question.